IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs August 8, 2017

FILED
09/01/2017
Clerk of the
Appellate Courts

## VERNICA SHABREE CALLOWAY, AKA VERNICA S. WARD, AKA VERNICA JACKSON v. STATE OF TENNESSEE

**Appeal from the Criminal Court for Davidson County
No. 2007-C-2178    Cheryl A. Blackburn, Judge**

_____

### No. M2016-02576-CCA-R3-PC
_____

The petitioner, Vernica Shabree Calloway, a.k.a. Vernica S. Ward, a.k.a. Vernica Jackson, appeals the denial of her post-conviction petition, arguing trial counsels' strategy regarding the use of expert witnesses on behalf of her defense was ineffective. Following our review, we affirm the denial of the petition.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

J. Ross Dyer, J., delivered the opinion of the court, in which Robert W. Wedemeyer and D. Kelly Thomas, Jr., JJ., joined.

Kara L. Everett, Carthage, Tennessee, for the appellant, Vernica Shabree Ward.

Herbert H. Slatery III, Attorney General and Reporter; James E. Gaylord, Senior Counsel; Glenn Funk, District Attorney General; and Katrin Miller, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

### *Facts and Procedural History*

#### A.    Trial Proceedings and Direct Appeal

The petitioner was convicted by a Davidson County Criminal Court jury of aggravated child neglect and reckless aggravated assault, for which she received an effective sentence of twenty-five years imprisonment. This Court affirmed her convictions on direct appeal, and our Supreme Court denied her application for permission to appeal. *State v. Vernica Shabree Calloway*, M2011-00211-CCA-R3-CD, 2014 WL 1394653, at *1 (Tenn. Crim. App. Apr. 4, 2014), *perm. app. denied* (Tenn.

Sept. 25, 2014).  On direct appeal, this Court recited the following underlying facts and procedural history:

This case[] arises out of the [petitioner]'s having given birth at home on a toilet on October 31, 2006.  The [petitioner] took her newborn daughter to a hospital several hours later, and the child survived but suffered permanent brain damage as a result of "hypoxia," or a lack of sufficient oxygen, which occurred sometime around birth.  In August 2007, the [petitioner] was indicted for the aggravated child neglect, aggravated child abuse, and attempted first degree murder of the victim.  The attempted murder charge was dismissed prior to trial, however.

In order to understand the issues raised in this appeal, we must provide some background information about the [petitioner] and her criminal history.  Before the trial in this case, the [petitioner] was charged in the deaths of three other children, Stephen Ward, Alexis Humphreys, and Stephanie Ward, who had each, at separate times, died while under her care.  Stephen and Stephanie Ward were the [petitioner]'s son and daughter, and Alexis Humphreys was the daughter of the [petitioner]'s friend.

The [petitioner] was first tried and convicted of the second degree murder of her daughter, Stephanie Ward.  *State v. Ward*, 138 S.W.3d 245, 250 (Tenn. Crim. App. 2003).  Because Stephanie was the third child in the [petitioner]'s care to die of unexplained causes, the State's expert medical witnesses in that case relied on the "'rule of three,' *i.e.* the first unexplained child death in the presence of a sole caregiver can be classified as SIDS [Sudden Infant Death Syndrome], with the second such death classified as undetermined, and the third and subsequent deaths result in all of the deaths being classified as homicides by asphyxiation," in concluding that Stephanie's death was a homicide by asphyxiation.  *Id.* at 270-71.  This court reversed the conviction and remanded for a new trial due to the medical experts' reliance on the "rule of three" in reaching their determinations, even though the experts did not refer to it as such, concluding that neither the "rule of three" nor the concept behind the rule was a proper foundation under the standards set forth in *McDaniel v. CSX Transp. Inc.*, 955 S.W.2d 257, 265 (Tenn. 1997), for expert opinion testimony.  *Ward*, 138 S.W.3d at 271.

The [petitioner] was subsequently retried in that case.  The jury acquitted her of the second degree murder charge but could not reach a unanimous verdict on a lesser-included offense.  Although the charges

against the [petitioner] remained pending in that case, as well as in the cases involving the deaths of Stephen Ward and Alexis Humphreys, the State elected to try the [petitioner] next on the charges in the case at bar.

In the case at bar, both the [petitioner] and the State filed numerous pretrial motions, including a motion by the State "to use evidence of [the] [petitioner]'s prior conduct in support of expert witness testimony pursuant to Tenn. Rules Evid. 702-705." Specifically, the State sought to be allowed to provide information to medical experts "detailing evidence of the [petitioner]'s past conduct of smothering three children to death and evidence of the [petitioner]'s claims that Stephanie and Stephen Ward had episodes in which they stopped breathing before their death[s]." The State also sought permission to provide their medical experts with evidence that the [petitioner] had given birth to two other children who had been removed from her care and who had not suffered any episodes of breathing difficulties. The State asserted that such information was "foundational evidence to enable" their experts "to form reliable opinions as to the specific cause of [the victim's] asphyxial trauma" and to "formulate reliable opinions on whether the cause for [the victim's] injuries are the result of non-accidental trauma or resulted from some alternative cause."

The State also filed a motion to use evidence of the [petitioner]'s prior conduct pursuant to Tennessee Rule of Evidence 404(b). Specifically, the State sought permission to introduce at trial evidence "of the [petitioner]'s past conduct of causing the deaths of three other children through asphyxial trauma" and "that Stephen and Stephanie Ward sustained prior episodes of breathing difficulties while in the [petitioner]'s care prior to their deaths." The State argued that such information was "relevant to establish that [the victim] suffered asphyxial trauma through non-accidental means and that the [petitioner] knowingly or intentionally caused such injuries." The State additionally argued that "[t]he facts surrounding the pregnancy and birth of [the victim] additionally demonstrate the [petitioner]'s repeated efforts to conceal her pregnancy from those who might intervene to protect the welfare of her child, and provide compelling circumstantial evidence of the [petitioner]'s ongoing 'common scheme or plan' to cause injury to children through means of asphyxial trauma and then to cover up her misdeeds through a web of deceit."

The State, therefore, requested that, in addition to evidence of the [petitioner]'s involvement in the deaths of the three other children, it be allowed to introduce at trial a number of other pieces of evidence, including

evidence that DCS had previously removed two other children from the [petitioner]'s care during the pendency of the criminal proceedings against her based on the deaths of the three children; evidence that the [petitioner] had violated various conditions of her bond; evidence that the [petitioner] concealed her pregnancy during a September 5, 2006 court appearance; evidence of the [petitioner]'s efforts to conceal her pregnancy from her co-workers, employers, and various medical professionals; evidence that the [petitioner] repeatedly provided false information about her pregnancy history; and evidence that the [petitioner] refused to provide the names of her previous children to DCS employee Cheryl Gooch. The State argued that such evidence "provide[d] a conceptual framework for understanding the [petitioner]'s conduct in regards to the pregnancy and birth of [the victim]" and was "relevant to establish the motives behind the [petitioner]'s efforts to conceal her pregnancy with [the victim], her motivations in failing to pursue appropriate prenatal care, her refusal to give birth at a hospital and her actions in concealing the delivery of [the victim] before she went to [the hospital]." The State further argued that the "other acts" evidence, which included the [petitioner]'s "entire course of conduct," was "necessary to sustain the willingness of jurors to draw the inferences necessary to reach an honest verdict, and that the exclusion of parts of this evidence would create an incomplete picture of the offenses, the relationship of the parties, and a conceptual and chronological void that would like[ly] lead to an incorrect assessment of the evidence involving the indicted acts."

Thereafter, the trial court held a series of pretrial hearings at which it considered the parties' various motions, including the ones detailed above. The trial court issued several rulings throughout the pretrial period, some of which we will review after summarizing the relevant testimony from the pretrial hearings.

### January 9, 2008 Pretrial Hearing

Lindy Miller, a physical therapist at Concentra Medical Center, testified that she began treating the [petitioner] on October 27, 2006, for a hand injury and saw her again on October 31, 2006, and November 7, 2006. She also saw the [petitioner] for another appointment between the October 31 and November 7 visits but could not recall the exact date. Miller obtained a medical history from the [petitioner] during her first visit, but the [petitioner] provided no information indicating that she was pregnant. During the October 31 visit, the [petitioner] said she was having a lot of

pain and trouble doing her exercises, so the treating orthopedic physician, Dr. Steve Salyers, prescribed medication for her.  At the November 7 visit, the [petitioner] informed Miller that she had had a baby but had been unaware that she was pregnant.  Miller said she never suspected that the [petitioner] was pregnant.

Lorraine Pipkins testified that she and the [petitioner] had been co-workers and that the [petitioner] lived with her at her apartment in Nashville for about a month before the instant offense.  The [petitioner] left Pipkins' apartment the night of October 31, 2006, and did not return until about a week later to collect some clothes.  At that time, the [petitioner] told Pipkins that she was going to the hospital, but Pipkins did not know that the [petitioner]'s child was in the hospital.

Detective Sarah Bruner of the Metro Police Department Youth Services Division testified that she was contacted by Virginia Thomas of the DCS to assist with interviewing the [petitioner] regarding the circumstances of the victim's birth.  Thomas informed Detective Bruner that the [petitioner] had been charged with the deaths of three other children.  Detective Bruner interviewed the [petitioner] at Baptist Hospital on November 16, 2006.  Bruner made a CD copy of the interview, which was admitted into evidence.  During the interview, the [petitioner] was not physically restrained, did not appear to be under the influence of alcohol or controlled substances, and denied using drugs prior to giving birth to the victim.  Explaining the victim's birth, the [petitioner] said she had squatted over the toilet, there was a pop and a gush of water, and she then gave two pushes delivering the victim whom she pulled up to her chest.  According to the [petitioner], she then passed out.  The [petitioner] also said the victim cried vigorously, both before the [petitioner] passed out and later as she was taking the victim to the hospital.

The [petitioner] brought up the names of three deceased children, Stephen Ward, Stephanie Ward, and Alexis Humphreys, in the interview and made statements about them.  She talked at length about how it bothered her that people thought she was guilty of killing those children.  Detective Bruner said that the [petitioner] was not in custody at the time of the interview, which lasted three hours and twelve minutes.  She acknowledged that she did not ask the [petitioner] if she wished to have an attorney present for the interview or if she was presently represented by counsel for matters pertaining to those children.  Detective Bruner learned

that the [petitioner] had also used the last names of Ward and Jackson in the past and had a criminal record under the name of Ward.

### April 21, 2008 Pretrial Hearing

Dr. Robert Reece, a pediatrician and the director of the child protection programs at Tufts Medical Center in Boston, Massachusetts, testified his area of specialization was child abuse pediatrics and he had authored a chapter about the distinction between fatal child abuse and SIDS in the textbook, *Child Abuse Medical Diagnosis and Management.* He said he was the executive editor of *The Quarterly Update,* a review journal that "reviews articles that have to do with child abuse or things that could be confused with child abuse as well as dealing with professional issues in the field of child abuse and neglect." Dr. Reece frequently taught at conferences on subjects dealing with child abuse, including differentiating between children who suffer injuries from a suffocation method versus an accidental method. He had been qualified as an expert in the field of pediatrics and child maltreatment in ten or twelve other jurisdictions and was accepted by the trial court as an expert in that field.

Dr. Reece testified that hypoxia "means too little oxygen for the tissue that's being supplied with oxygen. So you get injury as a result of too little oxygen." He said that a hypoxic injury to the brain of a newborn can occur as the result of an accident, during the birthing process, or from intentional causes. He stated he reviewed the same sources of information when evaluating hypoxic injuries in children whether the child lived or died. He explained, "It's a matter of degree of the hypoxia as to whether or not the child goes on to death or whether it stops short of death." He said that external evidence is not always present when a child suffers a hypoxic injury and explained that "many times a baby can be smothered without any external evidence of that smothering." Dr. Reece noted that when there is no physical evidence to establish how a hypoxic injury occurred, it is "critical" to have "as much information about the medical history of the baby, the social history, the family history, the genetic history, the history of the pregnancy, the labor and delivery, [Child Protective Services] involvement, [and] law enforcement involvement."

Dr. Reece acknowledged that he had not received or evaluated any of the victim's medical records, social services history, or police reports but knew that the victim had been brought to the emergency room with a hypoxic and ischemic injury resulting in the death of brain tissue as

revealed by an MRI. He said that the victim's brain wave test was abnormal, indicating a cerebral injury. Dr. Reece said that, in order for him to determine the cause of the victim's hypoxic injury, he would need to know the circumstances surrounding the victim's birth, including information about the mother's health during pregnancy, how many prior pregnancies she had experienced, the length of labor, previous labors the mother may have had, whether the victim cried at the time of delivery, and whether the victim's birth had produced apnea or hypoxia. He noted that it would also be important to know the mother's pattern of behavior toward other children, whether the victim was a wanted baby and whether "this was something that would give some kind of motive to dispose of the baby." He said that inconsistent histories were "always worrisome . . . when we're trying to establish between a legitimate medical condition and something that has been produced by abuse." Medical histories for other children born to the victim's mother would also be important in formulating an opinion as to the cause of the victim's injury because there were "so many question marks around the birth of [the victim]. The previous history of other children having suffered other kinds of problems would make one lean further in the direction of saying that this is an unsafe home." Dr. Reece explained that the term "apparent life threatening events" are events that "would make one believe that a serious and possibly fatal outcome could be expected if intervention is not attempted." He said it was important to know if there was a history of similar events involving the victim's siblings and other children in the care of the [petitioner].

On cross-examination, Dr. Reece agreed that there was limited time for a treating physician to obtain historical information when a child is brought in to the emergency room with the symptoms the victim had. Asked what effect he thought the [petitioner]'s taking Hydrocodone on the day of the victim's birth had on the victim's condition, Dr. Reece replied, "I don't think much . . . unless it was an ongoing use of that drug. . .. I don't think that has anything to do with the [victim's] presentation." He acknowledged that there was no medical test to determine exactly when the victim's hypoxic injury occurred but said that the fact that the victim cried immediately at birth indicated "there was probably no prenatal hypoxia going on." However, he agreed that the only information he had to rely upon was what the [petitioner] provided and that if the information was inaccurate, it called into question whether he could eliminate prebirth hypoxia or during-birth hypoxia as the cause of the victim's injury. He said that if the mother had a negative social history, including drug abuse or a

previous history of having abused or killed a child, "then child abuse will rise up pretty high on the list" as the cause of the injury.

Dr. Reece agreed that if a woman became pregnant, did not seek an abortion in a timely fashion, did not want the child, did not tell anyone that she was pregnant, and no one realized that she was pregnant, it would not be difficult for her to physically asphyxiate the child and cause the child's death. Because the [petitioner] related that the victim cried immediately after birth, as well as on the way to the hospital, Dr. Reece opined that the victim did not have any signs of a hypoxic injury during birth but agreed that his conclusion rested upon the reliability and accuracy of the [petitioner]'s account of the birth.

In response to questioning from the trial court, Dr. Reece said that in determining the cause of the victim's hypoxic injury, it was important to know if any of the victim's siblings suffered from a metabolic disease or genetic condition that could lead to apnea. He also said that it would be important to know the circumstances of the victim's birth. He opined, "In this case to be perfectly honest I can't think of much else that would cause this baby to have suffered this hypoxic injury than having been asphyxiated. There's just nothing else here that I've been provided that would tell me what this is due to."

On redirect examination, Dr. Reece agreed that it was very difficult to differentiate between deaths caused by SIDS and suffocation.

### June 4, 2010 Pretrial Hearing

Cheryl Gooch, a former DCS employee, testified that she was assigned to investigate the victim's case and that she interviewed the [petitioner] prior to the [petitioner]'s November 16, 2006 interview with Detective Bruner. During Gooch's interview, the [petitioner] refused to provide the names of her other children despite Gooch's asking her several times. Gooch then advised her supervisor, Virginia Thomas, about the [petitioner]'s refusal to provide the names of her other children.

On August 4, 2008, the trial court entered a lengthy, detailed order in which it denied the State's motion to introduce evidence relating to the [petitioner]'s prosecution for the deaths of the three children, the removal of two children from the [petitioner]'s custody by DCS, and the [petitioner]'s bond violations. The trial court granted the State's motion to

introduce evidence that the [petitioner] concealed her pregnancy and repeatedly provided false information to medical personnel about her pregnancy, finding that such information was relevant to the [petitioner]'s motive and intent and that its probative value outweighed any prejudicial effect.

With respect to the State's request to provide information to its medical experts, the trial court ruled that the State could give "limited information" to their expert witnesses regarding the victim's siblings' deaths, *i.e.* that the cause of death should be disclosed but that the manner of death should be listed only as "undetermined." The court specifically ruled that the experts should not be informed that the deaths of any of the [petitioner]'s other children might have resulted from homicide, finding that it would be "too prejudicial" and could potentially "slant" the opinion of the experts. Further, the trial court ruled that the State could provide their experts with information about the [petitioner]'s pregnancy with the victim, the number of prior pregnancies the [petitioner] had experienced, her previous labors, the length of her labor, her health during pregnancy, the victim's medical records, medical histories of the [petitioner]'s other children including cause of death without indicating manner of death as anything other than undetermined, and any statements the [petitioner] made to law enforcement or medical personnel regarding her pregnancy with the victim and the birth of the victim or the births of her other children.

### June 7-10, 2010 Trial

Lorraine Pipkins testified that she met the [petitioner] while they were both employed at the Wendy's restaurant on Murfreesboro Road. After the two became "close," the [petitioner] told Pipkins that she was pregnant, but, on February 10, 2006, the [petitioner] informed Pipkins that her mother "told her that she had . . . lost the baby, she wasn't no longer pregnant." During the late summer of 2006, Pipkins and the [petitioner] had started working together at a Mrs. Grissom's restaurant. While Pipkins and the [petitioner] were at work one day, Pipkins overheard "a little old lady" ask the [petitioner] if she was pregnant. The [petitioner] responded, "[Y]ou got to be doing something to get pregnant," which Pipkins understood to mean that the [petitioner] was not pregnant.

Pipkins said that the [petitioner] came to live with her about a month before the victim's birth. During that time, the [petitioner] wore baggy clothing and did not appear to be pregnant. The [petitioner] had a white,

four-door car at the time. The [petitioner] suffered an on-the-job injury to one of her fingers while employed at Mrs. Grissom's, and her doctor excused her from work until her finger healed. The [petitioner] had a doctor's appointment on October 31, 2006, and arrived home between 4:00 and 4:30 p.m. as Pipkins was sitting on the front porch awaiting trick-or-treaters. The [petitioner] told Pipkins that she was "sick" and "hurting" and went inside the apartment and sat down in the living room. The [petitioner] "kept moaning and groaning like . . . she was hurting real bad," but she refused to go to the hospital. Pipkins later noticed that the [petitioner] had left the living room and gone into the bathroom where she remained for about forty-five minutes. While the [petitioner] was in the bathroom, Pipkins' daughter and grandchildren came to Pipkins' apartment so that one of the children could use the bathroom. The [petitioner], dressed in a towel, came out of the bathroom and asked Pipkins' daughter for "a pad." The [petitioner] then went into her bedroom and put on some clothes before leaving the apartment between 7:30 and 8:00 p.m. The [petitioner] took her purse with her when she left, and Pipkins' neighbor, Danny Gooch, told Pipkins that the [petitioner] had taken some towels with her. Pipkins said she did not see or hear a baby that night. The next day, Pipkins noticed some blood on the toilet, the edge of the sink, and bathtub, which she cleaned. Pipkins said she talked to the [petitioner] about a week later, and the [petitioner] told her that she had a "busted" ovarian cyst but did not tell her she had given birth to a baby.

Latoya Pipkins, Lorraine Pipkins' daughter, testified that she took her children trick-or-treating at her mother's apartment on October 31, 2006, between 4:00 and 5:00 p.m. She did not see the [petitioner] at that time. Latoya and her children returned to her mother's apartment between 8:30 and 9:00 p.m. and went inside. Latoya saw the [petitioner], who was "still dressed," go into the bathroom. Latoya's daughter had to use the bathroom, but the [petitioner] would not come out. The [petitioner] stayed in the bathroom for "at least forty-five minutes or longer" and then stuck her head out the door and asked Latoya for a sanitary napkin. Latoya could not see inside the bathroom when the [petitioner] opened the door. She did not hear or see a baby that night and left before the [petitioner] came out of the bathroom.

Danny Gooch testified that he met the [petitioner] while she was working at the Wendy's restaurant. He said that he and the [petitioner] had sexual relations and that the [petitioner] wore clothing when they had sex and did not appear to be pregnant. He and the [petitioner] went to a Dollar

General Store on October 30, 2006, and the [petitioner] purchased a pregnancy test, the results of which were positive. At the time, Gooch believed the child was his. The next day, October 31, Gooch took the [petitioner] to her physical therapy appointment for her injured finger and then to Walgreens to pick up a prescription. They then went to Lorraine Pipkins' apartment, and the [petitioner] said that her stomach was cramping. Gooch went outside and sat on the front porch with Ms. Pipkins. When Gooch went back inside, the [petitioner] was "just laying there crying" as if in pain. He offered to take her to the hospital, and the [petitioner] said, "[M]aybe later on." The [petitioner] left Pipkins' apartment sometime after 9:00 p.m., carrying her purse and a laundry basket full of clothes and towels, and told Gooch that she was going to her mother's house to wash the clothes. Gooch watched the [petitioner] as she placed the laundry basket in the front passenger's seat of her car and then drove off. He did not see or hear a baby that night.

Gooch said that the [petitioner] called him at about 4:00 the next morning and told him she was at Baptist Hospital and asked him to come there. When he arrived at the hospital, the [petitioner] told him she had delivered a baby. Although he did not believe that the victim was his child, he signed her birth certificate because he and the [petitioner] were "close" and he "felt like that was [his] duty." He said he did not know the identity of the victim's father. The [petitioner] later asked him to move her car, and he noticed some bloody towels on the driver's seat. He found the [petitioner]'s laundry basket, still containing clothes, in the trunk of the car. The [petitioner] asked him to take the clothes she wore to the hospital home and wash them, but he did not do so because the bag containing the clothes was "full of blood." He said he threw away the [petitioner]'s clothes and the bloody towels he found in her car. When he asked the [petitioner] where she had delivered the baby, the [petitioner] said, "[W]e'll talk about it," but they never discussed it again.

Andre Phillips testified that he met the [petitioner] in 2006 at the Buena Vista Apartments where the [petitioner]'s sister, Monica Ward, lived. He and the [petitioner] dated for about a month during the early part of 2006 and had sexual relations. At the time he dated the [petitioner], she was living with her mother in Antioch. About two or three days after the victim's birth, he learned that the [petitioner] had delivered a baby. He went to the hospital to see the victim because he believed she was his child. When he later talked to the [petitioner], she acknowledged that the victim

- 11 -

was his child. He said he did not know that the [petitioner] was pregnant until after the victim's birth.

Monica Ward, the [petitioner]'s sister, testified that the [petitioner] was thirty-two years old and had six children, including Stephen, who was born on December 2, 1998; Paul, who was born in April 2000; and Jaylin, who was born in August 2001 outside of a hospital setting. She did not know the [petitioner] was pregnant with the victim and when she talked to the [petitioner] on October 31, 2006, the [petitioner] did not say anything about being in labor. The [petitioner] called Ward from the hospital in the early morning hours of November 1, 2006, and told her she had given birth on October 31 but did not say where the victim was born. The [petitioner] told Ward that Andre Phillips was the victim's father and asked her to contact him. While Ward was at the hospital, she learned that Danny Gooch had volunteered to sign the victim's birth certificate listing himself as the father.

Officer Johnny Lawrence with the Metropolitan Nashville Police Department testified that he assisted Detective Sarah Bruner in collecting evidence at Pipkins' residence on November 22, 2006, and identified photographs he took of the residence. He also collected three samples from stains on the wall and door of the bathroom that could have been blood. The samples were submitted to the Tennessee Bureau of Investigation for analysis but tested negative for blood. He said that household bleach could "clean [blood] up where you can't find anything."

Dr. Steve Salyers, an orthopedic physician, testified that he treated the [petitioner] for her workers' compensation injury. He first saw her on October 24, 2006, during which time the [petitioner] did not advise him of her pregnancy. He again saw the [petitioner] on November 7, 2006, and learned from Ms. Miller that the [petitioner] had given birth. He prescribed Hydrocodone for the [petitioner] based on her complaint of pain during the October 24 visit and acknowledged that the prescription could have been filled on a different date. On cross-examination, Dr. Salyers said that, in preparation for his trial testimony, he had consulted an obstetrician and learned that Hydrocodone was considered a safe drug for the third trimester of pregnancy.

Cassandra Hester testified that in 2006 she was the care coordinator for the Neonatal Intensive Care Unit ("NICU") at Baptist Hospital in Nashville. She said that she had "basically cared" for the victim and met

with the [petitioner] to discuss the circumstances surrounding the victim's birth. The [petitioner] told Hester that she had given birth to the victim at home in the toilet and did not provide any information about the victim's condition at the time of birth.

Dr. Mary Jane Haynes, a neonatologist in the NICU at Baptist Hospital, testified that she examined the victim between 3:15 and 3:30 a.m. on November 1, 2006. She observed that the victim was "irritable . . . and very jittery. . .. [T]he baby was shaky and could not be consoled easily. The baby was stiff. The tone was increased." Dr. Haynes explained that increased tone meant that the victim's muscles were very rigid, or hypertonic. The victim also had an increased heart rate, or tachycardia. Because the [petitioner]'s drug screen was positive for opiates, Dr. Haynes initially thought the victim was having drug withdrawal. However, the victim's drug screen was negative, and Dr. Haynes and fellow physicians determined that the victim had suffered a hypoxic ischemic injury. The victim suffered seizures, and her blood sugar was high, which indicated significant stress or injury. The victim's sodium was low, and Dr. Haynes explained that babies get low sodium, or hyponatremia, from Syndrome of Inappropriate Antidiuretic Hormone ("SIADH"), which "typically occurs with an asphyxiating event about three days after the event occurs."

Dr. Haynes said she spoke to the [petitioner] between 3:15 and 4:25 a.m. regarding her medical history and the circumstances of the victim's birth. The [petitioner] reported that she had been pregnant four times and had delivered two children who were not in her custody. The [petitioner] also reported that she had little or no prenatal care and denied any drug use with the exception of Oxycodone, which she had taken for the past two days for her finger injury. As to the victim's birth, the [petitioner] gave Dr. Haynes the following account of events:

> She told me that she had delivered at home in the toilet. She had had some pain, went to the bathroom, had a normal bowel movement, then delivered in the toilet, passed out, woke up. And I've written here sometime between 8:00 and 12:00 midnight. That's when she told me she delivered, that she wasn't sure what time it was because she didn't know how long she had been passed out. She woke up, cut the umbilical cord. She could not tell me what she used to cut the umbilical cord. She could not tell me how long the baby had been in the toilet. She couldn't tell me any of the circumstances other than the very vague details that I'm giving you. She told me

- 13 -

that she tied the umbilical cord with a piece of gauze that she had on her injured finger. That's one thing I don't have written down, but I remember that because that was an unusual story for someone to tell me. She told me she drove herself to the hospital. That was about it. It was kind of difficult for me to talk to her. She appeared like she was high, like she was under the influence of drugs.

Dr. Haynes said that the victim's being born in the toilet "most definitely" would cause asphyxia. Dr. Haynes said that the victim's admission temperature was "ninety-six something" and opined that a baby born in a toilet would have had a much lower temperature. Because the victim was not born in the hospital, no Apgar score or blood gas test could be performed to help determine if the victim had experienced an asphyxial event from the birthing process. She acknowledged that the [petitioner] brought the placenta to the hospital but said that there was no evidence that the placenta had abrupted or torn away prior to the delivery of the victim. The victim's umbilical cord was also examined and determined to be a short cord, which meant it was less likely that the cord had gotten tangled or knotted.

The State posed a hypothetical question in which Dr. Haynes was asked to assume that the birth history provided by the [petitioner] was accurate, in that the [petitioner] squatted over the toilet thinking she was going to have a bowel movement but instead delivered the victim in two pushes; that after the second push the [petitioner] pulled the victim out and placed her on her chest before passing out; and that later the [petitioner] regained consciousness to find the victim pink in color and crying vigorously, both before and after she passed out. Dr. Haynes said nothing in that history suggested that an asphyxial trauma occurred during the birthing process. Dr. Haynes said that a baby who suffers asphyxial trauma in utero or during the birthing process was "usually hypotonic, floppy, non[-]responsive, doesn't breathe or irregular gasping kind of efforts," which could require resuscitation. According to Dr. Haynes, conditions that could compromise a baby during the birthing process included the umbilical cord being wrapped around the baby's neck or other part of the body, which was more typical with long cords; the baby's head being trapped in the birth canal; the baby not being in the appropriate position to deliver; and the placenta breaking loose. However, there was no evidence that any of those conditions had occurred and nothing in the history provided by the [petitioner] to suggest that the victim suffered the hypoxic injury a day or so before birth. The victim had no bruising or injuries

- 14 -

consistent with having been trapped in the birth canal. Dr. Haynes said that the victim's MRI revealed "changes that were characteristic of hypoxic-ischemic encephalopathy or an event that occurred around the time of birth." She explained that encephalopathy is abnormal brain function and said that the victim's brain injury was permanent. She said that the victim's MRI findings were "typical of an acute, sudden, severe episode of hypoxia."

Dr. Haynes said that if a baby suffered an asphyxial event in a hospital setting, the baby could be treated with head cooling therapy, but it must be done within six hours of the time of delivery. Any delay in seeking that type of therapy would compromise the welfare of the baby and make the condition worse. She said that the most important medical finding in terms of the timing of the victim's injury was the SIADH, which occurred in response to swelling of the brain. She explained that SIADH typically occurred within three days of the injury and said that the victim's sodium level was first noted to be low on November 3. She said that a low sodium level is the first clue to indicate SIADH. Dr. Haynes acknowledged that she had no way of determining exactly when the victim's hypoxic injury occurred because the victim was not born in the hospital.

Wendy Parrish, a registered nurse at Baptist Hospital, testified that she obtained the [petitioner]'s medical history at 1:50 a.m. on November 1, 2006, and the [petitioner] reported that she had had two prior term deliveries and an abortion. The [petitioner] also reported that she learned of her pregnancy two months prior to November 1 and had been to the Waverly Belmont Clinic twice.

Cherie Hackney testified that she was a social worker at Baptist Hospital in 2006 and met with the [petitioner] on November 1, 2006. The [petitioner] told Hackney that she gave birth to the victim at home on the toilet, passed out for a period of time, and, when she woke up, retrieved the victim from the toilet before driving herself to the hospital. The [petitioner] gave no information as to how the victim presented at the time of birth or after the [petitioner] regained consciousness. Hackney said that her notes reflected that the father of the victim, "Danny," was with the [petitioner] at the hospital.

Jimmy Smith, an emergency room nurse at Baptist Hospital in 2006, testified that he was working the 7:00 p.m. to 7:00 a.m. shift on October 31-November 1, 2006, when an unidentified woman came into the hospital

around midnight and said there was a woman in the parking lot who had delivered a baby in the car. Smith went outside and found the [petitioner] sitting in the driver's seat of a white Ford Taurus in the last ambulance bay. The [petitioner], who was dressed in a sweatsuit and smelled strongly of soap or perfume, indicated that she had just given birth in the car in the parking lot, and Smith saw a newborn baby wrapped in a towel in the passenger's seat. The baby was not crying, made no movements, and "seemed lifeless." He immediately took the baby into the hospital and gave the baby to other nurses.

Smith said that he then went back outside to tend to the [petitioner] and noticed there was no blood or "mess" that goes along with childbirth in the car. The [petitioner] reported that she knew she had been in labor, and when Smith asked her why she had not come to the hospital sooner, she was "very evasive" and said "it was a personal matter." Smith described the [petitioner]'s emotional affect as "an extremely flat affect. She showed . . . no real emotion, either excitement or depression." No one else was in the car with the [petitioner], and Smith assisted her into a wheelchair. As he helped the [petitioner] out of the car, he noticed a "blood line" at "the crack of her bottom" and a small amount of blood, about two inches by three inches, on the driver's seat of the car. He said he would have expected a larger amount of blood if she had in fact given birth in the car. With the [petitioner]'s permission, he moved her car from the ambulance bay to a parking lot. The [petitioner] asked him to retrieve the placenta from under the seat, and he located a plastic bag containing what he believed to be bloody tissue but did not look inside the bag. He placed the bag on the [petitioner]'s lap and wheeled her inside the hospital to the labor and delivery department.

Smith said that he gave a statement to Detective Sarah Bruner on January 9, 2007, and said that the only difference between his recollection and the statement was that the statement reflected that the [petitioner] was holding the baby, but he remembered the baby was in the passenger's seat. He said he had no doubt that the baby was in the passenger's seat.

Virginia Thomas of the DCS testified that the [petitioner]'s other children included Stephan, who was born on April 15, 1995; Stephanie, who was born on November 13, 1997; Steven, who was born on December 2, 1998; Paul, who was born on April 8, 2000; and Jaylin, who was born in August 2001.

Dr. Carol Cistola, an OB/GYN physician, testified that she examined the [petitioner] at the Waverly Belmont Clinic on September 15, 2006. The [petitioner] was a walk-in patient and reported that she had not received any prenatal care. The clinic records reflected that the [petitioner] had been advised of her pregnancy on March 16, 2006, and given an estimated due date of November 15. The [petitioner] also saw an internal medicine doctor at the clinic on September 12 for low blood pressure. According to the medical history the [petitioner] provided to the internal medicine doctor, the [petitioner] had been pregnant six times and had five deliveries. However, the [petitioner] told Dr. Cistola she had been pregnant eight times. Dr. Cistola's examination of the [petitioner] showed no indication that the baby was going to be born prematurely, and the baby's heart rate was normal. The [petitioner] left the clinic without getting the recommended prenatal lab work done and did not return for follow-up testing and treatment.

Dr. Cistola said that the [petitioner] received treatment at the clinic three times in 1998 for another pregnancy. The [petitioner] was hospitalized on September 26, 1998, for preterm labor and had a premature delivery in December 1998. The [petitioner] also received treatment at the clinic for another pregnancy in 2000 but had only two prenatal visits although the normal number of visits for a non-high-risk mother was thirteen. For a patient who had a prior complicated pregnancy like the one the [petitioner] had in 1998, the number of prenatal visits would have been as many as were needed and could have been daily.

Detective Sarah Bruner testified that she and another officer searched Pipkins' residence on November 22, 2006, but found no indication of blood, and they were unable to locate the [petitioner]'s car or clothing she had worn the night of the victim's birth. Detective Bruner recovered ten pink pills in a bottle labeled prenatal care, which reflected that the prescription was filled on March 16, 2006, and written for a quantity of thirty with four refills.

Detective Bruner said she later obtained the [petitioner]'s cellular telephone records which reflected a number of calls made to and from the [petitioner]'s phone on October 31 and November 1, 2006. The [petitioner] provided no information that anyone other than she had possession of her telephone on those days. The [petitioner] gave Detective Bruner detailed information regarding her prenatal care with Steven and Paul but did not discuss Jaylin. Detective Bruner obtained the [petitioner]'s Hydrocodone

medication from Ms. Thomas and placed it into evidence. She said that the prescription bottle contained thirty-eight pills and that the paperwork accompanying the prescription reflected that forty pills were prescribed and that the prescription was filled on October 31, 2006, at 5:57 p.m.

Detective Bruner said she interviewed several witnesses, including Jimmy Smith. Smith reported that the victim was on the [petitioner]'s lap and that there was a towel in the seat of the car where the [petitioner] had been sitting. Smith did not indicate that the [petitioner] had reported giving birth in the car in the parking lot.

Cheryl Gooch, a DCS case manager in 2006, testified that the department received a referral concerning the victim on November 2, 2006. She was the initial case manager assigned to the case and interviewed the [petitioner] at the DCS office, prior to Virginia Thomas' interview at the hospital. The [petitioner] reported that she had an injured finger for which pain medication had been prescribed, but she did not inform the doctor that she was pregnant. The [petitioner] gave the medication to Gooch, and she turned it over to Thomas. The [petitioner] told Gooch she was about six or seven months along with her pregnancy before she found out she was pregnant. Gooch said the [petitioner] told her that Danny Gooch had come by her residence before she gave birth to the victim, but no one was present during the birth. The [petitioner] reported that she delivered the victim at home on the toilet between 8:30 and 9:00 p.m. and put the baby on her chest before passing out for an unknown period of time. The [petitioner] said she went to the hospital around midnight. Gooch asked the [petitioner] several times for information regarding her other children, but the [petitioner] refused to disclose their names.

Dr. Kendall Graham, a neonatologist at Baptist Hospital, testified that he was one of the primary physicians who began treating the victim on November 1, 2006. He described the victim's condition as "jittery and kind of irritable, difficult to console." The doctors initially thought the victim was going through drug withdrawal because of the [petitioner]'s positive drug screen and the history provided by the [petitioner] that she had been taking a narcotic for pain relief prior to delivery. However, during the next three days, the victim began showing signs of seizure activity and SIADH, which was common in infants who had suffered an asphyxia event. The doctors realized the victim was not suffering from a narcotic withdrawal but was showing symptoms consistent with having suffered some type of asphyxia around the time of birth. An EEG performed on the victim on

November 3 revealed seizure activity, and an MRI performed on November 14 or 15 showed that the victim had suffered injury to the deep parts of the brain. Dr. Graham said that the pattern of the victim's brain injuries was consistent with birth asphyxia.

Dr. Graham said that infants who suffer a serious hypoxic injury during the birthing process do not cry vigorously. He said that the victim had suffered "a mild to moderate" permanent hypoxic injury "very near the time of birth." Based upon the information the doctors had, there was no definitive way to determine whether the victim's hypoxic injury occurred before birth, at birth, or after birth. However, Dr. Graham said that he was "comfortable" in saying that the victim's injury occurred within a few hours before birth through the time of birth to a few hours afterwards. He said that the [petitioner]'s use of Hydrocodone the night of the victim's birth did not cause the victim's hypoxic injury.

Dr. Robert Reece's trial testimony reiterated that given at the pretrial hearing, and he acknowledged that he had been retained by the State to consult in the case. He further said that when evaluating whether a child suffered an asphyxial event, he looked to a broad spectrum of information, including information regarding the child's siblings, social service investigations of the family, prior police investigations, and prior medical histories of the family to determine if there were any predisposing factors for certain medical conditions. He reviewed the victim's medical records from Baptist Hospital, the police reports, social service reports, the prenatal history provided by the [petitioner], and the medical histories involving other children and agreed with the medical assessment that the victim sustained a hypoxic injury. He said it was "difficult" to determine the time of the injury but agreed with Drs. Haynes and Graham that it occurred at or around the time of birth. Dr. Reece said that he reviewed all of the historical information provided by the [petitioner] and observed that "the history was changing. There were several different accounts of what happened," which was "a big red flag" to him. Dr. Reece said that he had "a very strong feeling" and had determined to a reasonable degree of medical certainty that the victim's injury was the result of an induced suffocation. He related the factors he considered in reaching that conclusion:

> [T]he fact that the baby was, first of all, born in a toilet, then cried immediately after the baby was born according to the mother's account. Then there was a passing out of the mother according to her

- 19 -

account during which time we don't know what was going on with the baby. Then there was no call for help, no call to 911 to EMS to come and help with the baby. And then there was an almost four hour delay between the time that we are told the baby was born and the arrival at the emergency department. And then even at the emergency department there was a delay of sitting in the car for a good period of time and being discovered there by one of the nurses from the hospital. So all of this makes me concerned about what was going on in that interval.

Dr. Reece said that the [petitioner]'s giving birth at home and not seeking medical assistance in a timely fashion suggested that "there wasn't a whole lot of attention being given" to the victim. In evaluating child abuse and neglect cases, a delay in seeking medical care was "[a]bsolutely" something he saw frequently. Dr. Reece said that the [petitioner]'s delay in seeking medical care, failure to call EMS at the time of delivery, "spotty" prenatal care, and failure to make arrangements for a hospital delivery constituted "a fairly neglectful approach to a newborn baby."

Dr. Reece said he had delivered approximately 150 babies and had been present when birth asphyxia occurred. In those situations, the newborns usually had a "weak cry if a cry at all." Nothing in the history provided by the [petitioner] or in the medical findings indicated that the victim suffered the asphyxial trauma prior to birth or during the birthing process. There was no meconium on the victim's skin which indicated that the victim was "born healthy and alive and vigorous."

Dr. Reece identified a policy statement from the American Academy of Pediatrics entitled *Distinguishing Sudden Infant Death Syndrome From Child Abuse Fatalities,* published in July 2006, which was admitted into evidence.

Clechette Frazier-Weir, the victim's foster mother, testified that the victim came into her care on November 14, 2008, at the age of two, and weighed only fifteen pounds, could not crawl, walk, or talk, and could "[b]arely" sit up on her own. She said that at the time of trial, the victim weighed 27.14 pounds, had cerebral palsy, and was developmentally delayed. The victim was able to walk with the aid of special shoes and a K-walker when in crowds and could talk in complete sentences. Ms. Frazier-Weir explained that she "constantly" worked with the victim and described the type of care the victim needs:

In a day we do over eighty exercises a day. Feeding was taking like an hour and a half . . . for her to really feed herself. To get all of her therapy at home and then going to physical therapy and getting it done -- because what they implement at Vanderbilt I take home and just keep adding to it. So it's a day's work.

In addition, the victim received speech therapy and had to see a neurologist and orthopedic doctor annually. Ms. Frazier-Weir said that she planned to adopt the victim.

The [petitioner] elected not to testify and presented no proof. The jury convicted her of aggravated child neglect as charged in Count 1 of the indictment and of the lesser-included offense of reckless aggravated assault in Count 2, which the trial court merged with the neglect conviction.

At the sentencing hearing, Ms. Frazier-Weir testified that the victim's doctors had informed her that the victim would always need assistance and would never be able to live independently.

*Calloway*, 2014 WL 1394653, at *1-15 (footnotes omitted).

## B.    Post-Conviction Proceedings

On March 30, 2015, the petitioner filed a pro se petition for post-conviction relief claiming, in part, that her conviction was based upon the use of evidence obtained pursuant to an unlawful arrest and that her due process rights were violated based upon a "tainted" prosecutorial investigation. Upon review of the petition, the post-conviction court found the petitioner failed to provide any facts supporting her allegations. As such, the post-conviction court ordered the petitioner to file an amended petition for relief in which she was to allege facts supporting the grounds set forth in her petition. The petitioner complied, and filed an amended petition for post-conviction relief on May 8, 2015.

In the amended petition, the petitioner asserted prosecutorial misconduct, ineffective assistance of counsel, and that she was not given proper *Miranda* warnings prior to her arrest. As to her ineffective assistance of counsel claims, the petitioner alleged trial counsel failed to present evidence on her behalf at trial and prevented her from testifying at trial. Specifically, the petitioner argued trial counsel "should have subpoenaed the medical professional from the hospital that told the [p]etitioner she was an overly concerned parent because she brought her child into the emergency room

repeatedly" in an effort to prove "that she was concerned for her child and wanted to protect and care for her." On May 21, 2015, the post-conviction court appointed counsel and entered a preliminary order finding the petition "may present a colorable claim."

Post-conviction counsel then filed an amended petition alleging trial counsel: (1) failed to present "legitimate defenses" on behalf of the petitioner; (2) failed to "properly interview" or counsel the petitioner prior to trial; (3) failed to "properly investigate relevant issues" or witnesses "who may have been present during the commission of this crime and what their perceptions and memory were to these events;" (4) failed to "properly advise" the petitioner regarding her right to testify; (5) failed to "properly explain" the trial process, discovery, or the penalties of conviction to the petitioner; (6) failed to "properly research, qualify and prepare defense expert in neonatology, Dr. Jeffrey Pietz;" and (7) failed to "properly identify the need for an expert in child abuse to present in the defense of the [p]etitioner at trial." The petitioner also alleged appellate counsel failed to "adequately raise all issues in [the] [p]etitioner's direct appeal."

In its denial order, the post-conviction court summarized the evidentiary hearing testimony, as follows:

At the evidentiary hearing, the trial transcript and relevant transcripts from the hearings in this case - some of which overlapped with case no. 2004-D-2901 - were admitted into evidence along with the testimony of [t]rial [c]o-[c]ounsel, [lead counsel] and [co-counsel]. [The] [p]etitioner elected not to testify at the post-conviction evidentiary hearing.

**A. [Lead Counsel]**

[Lead counsel] is the elected Public Defender for Nashville, and has served in this capacity for the past eight years, which included some of the time she served as the [p]etitioner's trial counsel. When asked about the defense strategy for trial, [lead counsel] responded that the State could not prove that the [p]etitioner had neglected or caused injury to her child. [Lead counsel] elaborated that the defense position was no medical proof existed to establish whether the injuries to the child occurred during the child's birth, prior to birth, or after birth; thus, the State could not prove cause of the medical condition.

[Lead counsel] agreed that trying the case required experts, and fairly early on, the State indicated that it intended to call Dr. Robert Reece, and the State had involved two neonatologists with the intention at least one would testify - ultimately both were called as [the] State's witnesses at [the]

[p]etitioner's trial. [Lead counsel] testified that Dr. Reece was a pediatrician and, therefore, qualified in that field and qualified as an expert in child abuse. She thought he may have been qualified as an expert in child neglect as well, but she was not certain.

[Lead counsel] testified that she and her co-counsel researched potential experts for her client. They decided to hire neonatologist Jeffrey Pietz. [Lead counsel] did not recall looking for an expert in child abuse or neglect. She described the defense strategy was focused on the State's inability to prove (1) when the [victim's] conditions occurred and (2) what produced the injuries when [the victim] arrived at the hospital. [Lead counsel] testified that, in her view, the issue was a medical question. She noted that "right before the trial" - either the week prior to trial or the week of the trial - the thought occurred to her that the defense may have made a mistake and they may need a child abuse expert to rebut Dr. Reece.

In attempt to cure what was described as a possible strategic mistake, [lead counsel] described filing additional motions on the "eve of trial" because she felt that the defense had not received a full hearing on Dr. Reece. [Lead counsel] testified that they were unsuccessful with the motions and raised the issues on direct appeal. [Lead counsel] acknowledged that the defense did not request to continue the trial to seek an expert. She noted it has been six years since she tried the case, so she does not recall when the thought occurred to her to have a child abuse expert - rather than a medical expert - to rebut Dr. Reece. She stated that in hindsight, if she had to do the trial over, she would not look at it as a case of "dueling neonatologists" but rather dueling child abuse experts.

[Lead counsel] described how she vetted Dr. Pietz as a potential expert. She was not sure where she first obtained his name, but thought it was from National Child Abuse Defense & Resource Center network. [Lead counsel] testified that she typically runs a Westlaw search on all experts, and Dr. Pietz comes up in several reported opinions.

[Lead counsel] had received Dr. Pietz's report and believed he was prepared for trial - until an issue arose either the week of the [p]etitioner's trial or the week prior to trial. [Lead counsel] was not certain as to the timing. She testified that as Dr. Pietz travelled to Nashville, she felt that he had closely read the materials that the defense had sent him; he had indicated he reviewed the materials based on the report he generated. She further testified that when he arrived, or possibly when they spoke the week

before, Dr. Pietz seemed to offer additional opinions related to [the victim's] conditions. Dr. Pietz rendered these additional opinions based on notations he saw in [the] [p]etitioner's medical file, and he referenced other records previously provided to him that were "impacting conclusions" that he had drawn. [Lead counsel] testified that in a way she felt like he was giving "in some respects a better, stronger opinion." Dr. Pietz, however, provided a significant finding shortly before trial that he did not write in his report or discuss with counsel on any prior occasion. [Lead counsel] felt like Dr. Pietz "just discovered" the finding on his flight to Nashville, which she found troubling.

When asked to elaborate why she found Dr. Pietz's additional finding that benefited the defense to be troubling, [lead counsel] explained that the defense already had provided Dr. Pietz's report to the State as required prior to trial. Further, since she does not have a medical background, conclusions he made were beyond the scope of her expertise and she needed time to analyze his additional findings in light of the planned defense strategy and time to compare the findings to what the other neonatologist who treated [the victim] had found.

[Lead counsel] testified that Dr. Pietz's additional opinions before trial impaired the defense's ability to conduct an effective cross-examination and impaired the defense's ability to put Dr. Pietz on the witness stand due to concerns he would offer a different opinion than what he put in his report, which would undermine his credibility and "open more discussion" should the State call the neonatologist for rebuttal proof. Thus, Dr. Pietz created a situation that [lead counsel] said left the defense "unsure about the wisdom of calling him" and raised concerns about whether calling Dr. Pietz as an expert witness would hurt her client's defense rather than helping as intended.

When trying to pinpoint when she first learned of Dr. Pietz's additional findings, [lead counsel] recalled her concerns were raised the week before trial or the week of, but she knew concerns developed when Dr. Pietz arrived to town, citing information gleaned from a dinner meeting her co-counsel had with Dr. Pietz after [co-counsel] picked up their expert from the airport. [Lead counsel] testified she arrived at the office the next morning "having panic over a conversation" that [co-counsel] said he had with Dr. Pietz at dinner that differed from prior discussions the defense had with Dr. Pietz.

[Lead counsel] testified that in hindsight she felt she did not do everything she should have done concerning Dr. Pietz and recalled that he had been difficult to reach prior to trial. She stated that she should have ensured he focused on the case sooner than he did, but noted in other respects that she "had no idea" he had not read the records closely when the defense provided them based on the report he prepared in May.

When asked when did she realize the need for a child abuse expert, [lead counsel] responded that she was not certain when she recognized that need but it may have well been during the trial. She explained the defense had been focused on the medicine and she believed the State could not win on the medicine, noting, "the State won on bringing in the hired gun."

[Lead counsel] agreed with [p]ost-[c]onviction [c]ounsel that the defense should have had an expert in the same field.

[Lead counsel] agreed that she explained the trial process and went over the State's evidence with her client. She also agreed that while she does not have independent recollection of going over *Momon* criteria with [the petitioner], it is her standard practice to discuss with her clients their right to testify and review the pros and cons of doing so. [Lead counsel] was unsure whether she or [co-counsel] reviewed [the petitioner's] right to testify with her.

During cross-examination, [lead counsel] testified that she has served as an attorney with the Nashville Public Defender's Office for approximately 11 years. She estimated that over her career she has handled 40 trials, including some death penalty cases. [Lead counsel] agreed that this case was not the first time she represented [the petitioner]; [lead counsel] served as one of the trial counsel when her office was appointed in late 1999, to represent [the petitioner] on three first degree murder cases. [Lead counsel] acknowledged that she represented the [p]etitioner on her first trial in May 2002, for some of the severed counts in case no. 2004-D-2901, where the [p]etitioner was convicted, but the conviction was reversed and remanded on appeal. [Lead counsel] also represented the [p]etitioner during the second trial / re-trial of those account that resulted in a hung jury.

[Lead counsel] agreed that she reviewed the discovery with the [p]etitioner although she was not sure if she provided the [p]etitioner with a copy, citing that it is sometimes dangerous to give discovery to clients

charged with "A" felonies because other inmates may try to become State informants.

In light of [the] [p]etitioner's allegations that trial counsel did not meet with her, the State inquired if [lead counsel] brought her time sheet to the hearing. [Lead counsel] confirmed she did and testified that her records for this case file reflect 14 meetings. [Lead counsel] qualified her statement, explaining that the time sheet shows only a fraction of their consultations because (1) [the petitioner] had another case pending at the time, and [lead counsel] did not log meetings from that case into this case file even though some of the meetings involved discussions about both cases; (2) due to the length of her representation of [the petitioner], [lead counsel] stopped counting their meetings after a certain date, and (3) [lead counsel] often meets with clients on court appearance dates, and those meetings may only be logged as court time in the client file. Thus, the time sheet does not accurately represent the amount of time she and [the petitioner] met - the calculations represented in this case file significantly underrepresent the amount of time she met with her client during the court of her representation.

During court questioning, [lead counsel] agreed that Dr. Pietz sat in court and listened to at least one of the neonatologists who testified - the one she believes the State presented out of order due to scheduling because Dr. Pietz was not in court to hear from both neonatologists. [Lead counsel] testified that Dr. Pietz tried to assist her during cross-examination of the State's medical experts, but the problem she had was his advice and assistance was based on conclusions and ideas he had during his flight to Nashville, and [lead counsel] was not involved in the conversation [co-counsel] had with Dr. Pietz upon Dr. Pietz's arrival. Thus, she explained that it was difficult to incorporate his new insights and process them during the trial.

[Lead counsel] agreed that she submitted a Rule 13 funding request for Dr. Pietz, and information as to why the defense needed his assistance would be contained in the motion she filed under seal with the court.

[Lead counsel] acknowledged that her client was not found guilty of child abuse; the jury convicted the [p]etitioner of aggravated child neglect.

[Lead counsel] was not sure how many pre-trial hearings were held in this case, but testified that throughout the case she requested more

hearings as to Dr. Reece and wanted a *McDaniel* hearing regarding Dr. Reece's ultimate opinion. [Lead counsel] acknowledged hearings were held on some issues such as whether [counsel for the State] committed violations that prevented Dr. Reece from testifying. When the Court noted that the defense pursued these issues on appeal, [lead counsel] agreed that issue "was explored" on appeal but she felt the Court of Criminal Appeals "dismissed it."

## B. Co-Counsel

[Co-counsel] testified that he no longer works at the Metro Public Defender's Office, but he worked in the capacity of an Assistant Public Defender when he represented the [p]etitioner, and he served as second chair alongside [lead counsel]. [Co-counsel] describes his responsibilities as working with expert witness Dr. Pietz and cross-examining some of the State's witnesses such as Detective Sarah Bruner and some of the civilian witnesses. He also handed (sic) the motion for judgment of acquittal.

[Co-counsel] noted that while he had not reviewed Dr. Pietz's curriculum vitae in a while, Dr. Peitz's expertise is neonatology, and when preparing for trial, [lead counsel] and [co-counsel] agreed that a neonatologist expert was necessary.

Since Dr. Pietz was not local, they did not meet in person during trial preparation and primarily communicated through email and sent records by land through "snail mail." They also spoke over the phone. [Co-counsel] recalled that he and [lead counsel] had some frustration with Dr. Pietz making himself available for consultations.

When Dr. Pietz came to Nashville for the trial, [co-counsel] picked up Dr. Pietz from the airport. [Co-counsel] testified that at that time Dr. Pietz offered an opinion on the case that differed from the opinion he had put in his written report, which had been provided to the State. [Co-counsel] testified that while the changes in Dr. Pietz's opinion were not detrimental to [the petitioner], [co-counsel] tried to explain to Dr. Pietz how his "more expanded opinion" would appear to the jury.

[Co-counsel] testified that had Dr. Pietz relayed his changes a few weeks prior to trial, the defense could have asked for an amended report. However, since the changes were discovered "mid-trial", the defense had to

make a tactical decision; thus, they decided not to call Dr. Pietz as a trial witness.

When asked if in hindsight would he have been more persistent in his contact with Dr. Pietz or done anything else different, [co-counsel] responded, "I wish we had not arrived where we did." [Co-counsel] testified that Dr. Pietz provided a report that was useful, but in light of the fact "he changed his opinion last minute", [co-counsel] wished they "were working with someone different."

When asked whether a neonatology expert was the only type of expert the defense considered, [co-counsel] replied that post-conviction counsel must be referring to the Dr. Reece testimony, and if [co-counsel] were to retry the case, he "would try to find someone who would mirror Dr. Reece to offer opposite opinion of Dr. Reece." [Co-counsel] testified that the defense knew of the State's intention of calling Dr. Reece prior to trial, but the defense did not have the intention of calling a refuting expert at the time.

During cross-examination by the State, [co-counsel] agreed that when calling an expert witness one never knows exactly everything the expert may say. [Co-counsel] also agreed that he was unable to say whether his client would have been acquitted had the defense called an expert to counter Dr. Reece - [co-counsel] was only able to testify that with 20/20 hindsight, he could only say that calling a different expert is something he would do differently if he re-tried the case.

The [c]ourt pointed during its questioning that Dr. Reece was not a surprise witness because he had been involved in the case for years. [Co-counsel] responded the defense was aware of Dr. Reece's opinions, but he thought the issue was the extent of Dr. Reece's trial testimony. As to why the defense did not hire an expert in child abuse, [co-counsel] was unable to provide a definitive answer.

When asked why the defense did not put Dr. Pietz on as a witness if his changed testimony was not detrimental but to the defense's favor, [co-counsel] cited "a couple of things." First, [co-counsel] testified that Dr. Pietz's revised opinion "was a contradiction to what he had previously said rather than expansion." Second, he testified that the defense "had actually gotten out of the experts everything we needed" and that it was a "tactical decision" not to call Dr. Pietz.

- 28 -

[Co-counsel] testified that based on the information provided by the State, medically, the hypoxic injury could have been prior to birth, which is why the defense did not focus on a child abuse and neglect expert, but focused on medical evidence.

Finding the petitioner failed to meet her burden of proof, the post-conviction court denied relief, and this timely appeal followed.

## *Analysis*

On appeal, the petitioner asserts the post-conviction court erred in denying her petition for post-conviction relief, alleging trial counsel provided ineffective assistance of counsel by failing to "properly research, qualify and prepare defense expert in neonatology" and failing to "properly identify the need for an expert in child abuse" on behalf of the defense. In contrast, the State contends the petitioner failed to present sufficient evidence of trial counsels' deficiencies or how their alleged deficiencies prejudiced her trial. Upon our review, we agree with the State.

To obtain relief in a post-conviction proceeding, a petitioner must demonstrate that his or her "conviction or sentence is void or voidable because of the abridgement of any right guaranteed by the Constitution of Tennessee or the Constitution of the United States." Tenn. Code Ann. § 40-30-103. The post-conviction petitioner bears the burden of proving his allegations of fact by clear and convincing evidence. *See* Tenn. Code Ann. § 40-30-110(f). "'Evidence is clear and convincing when there is no serious or substantial doubt about the correctness of the conclusions drawn from the evidence.'" *Lane v. State*, 316 S.W.3d 555, 562 (Tenn. 2010) (quoting *Grindstaff v. State*, 297 S.W.3d 208, 216 (Tenn. 2009)).

Appellate courts do not reassess the trial court's determination of the credibility of witnesses. *Dellinger v. State*, 279 S.W.3d 282, 292 (Tenn. 2009) (citing *R.D.S. v. State*, 245 S.W.3d 356, 362 (Tenn. 2008)). Assessing the credibility of witnesses is a matter entrusted to the trial judge as the trier of fact. *R.D.S.*, 245 S.W.3d at 362 (quoting *State v. Odom*, 928 S.W.2d 18, 23 (Tenn. 1996)). When an evidentiary hearing is held in the post-conviction setting, the findings of fact made by the court are conclusive on appeal unless the evidence preponderates against them. *See Tidwell v. State*, 922 S.W.2d 497, 500 (Tenn. 1996). Where appellate review involves purely factual issues, the appellate court should not reweigh or reevaluate the evidence. *See Henley v. State*, 960 S.W.2d 572, 578 (Tenn. 1997). However, review of a trial court's application of the law to the facts of the case is de novo, with no presumption of correctness. *See Ruff v. State*, 978 S.W.2d 95, 96 (Tenn. 1998). The issue of ineffective assistance of counsel, which

presents mixed questions of fact and law, is reviewed de novo, with a presumption of correctness given only to the post-conviction court's findings of fact. *See Fields v. State*, 40 S.W.3d 450, 458 (Tenn. 2001); *Burns v. State*, 6 S.W.3d 453, 461 (Tenn. 1999).

The Sixth Amendment to the United States Constitution, made applicable to the states through the Fourteenth Amendment, and article I, section 9 of the Tennessee Constitution both require that criminal defendants receive effective assistance of counsel. *Cauthern v. State*, 145 S.W.3d 571, 598 (Tenn. Crim. App. 2004) (citation omitted). When a petitioner claims he received ineffective assistance of counsel, he has the burden to show both that trial counsel's performance was deficient and that counsel's deficient performance prejudiced the outcome of the proceeding. *Strickland v. Washington*, 466 U.S. 668, 687 (1984); *see State v. Taylor*, 968 S.W.2d 900, 905 (Tenn. Crim. App. 1997) (noting that the same standard for determining ineffective assistance of counsel applied in federal cases also applies in Tennessee). The *Strickland* standard is a two-prong test:

> First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.

466 U.S. at 687.

The deficient performance prong of the test is satisfied by showing that "counsel's acts or omissions were so serious as to fall below an objective standard of reasonableness under prevailing professional norms." *Goad v. State*, 938 S.W.2d 363, 369 (Tenn. 1996) (citing *Strickland*, 466 U.S. at 688; *Baxter v. Rose*, 523 S.W.2d 930, 936 (Tenn. 1975)). With regard to the standard, our Supreme Court has held:

> [T]he assistance of counsel required under the Sixth Amendment is counsel reasonably likely to render and rendering reasonably effective assistance. It is a violation of this standard for defense counsel to deprive a criminal defendant of a substantial defense by his own ineffectiveness or incompetence . . . Defense counsel must perform at least as well as a lawyer with ordinary training and skill in the criminal law and must conscientiously protect his client's interest, undeflected by conflicting considerations.

*Finch v. State*, 226 S.W.3d 307, 315-16 (Tenn. 2007) (quoting *Baxter*, 523 S.W.2d at 934-35).

When reviewing trial counsel's performance, this Court "must make every effort to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's conduct, and to evaluate the conduct from the perspective of counsel at that time." *Howell v. State*, 185 S.W.3d 319, 326 (Tenn. 2006) (citing *Strickland*, 466 U.S. at 689). The fact that a trial strategy or tactic failed or was detrimental to the defense does not, alone, support a claim for ineffective assistance of counsel. *Cooper v. State*, 847 S.W.2d 521, 528 (Tenn. Crim. App. 1992). Deference is given to sound tactical decisions made after adequate preparation for the case. *Id.*

To satisfy the prejudice prong of the test, the petitioner "must establish a reasonable probability that but for counsel's errors the result of the proceeding would have been different." *Vaughn v. State*, 202 S.W.3d 106, 116 (Tenn. 2006) (citing *Strickland*, 466 U.S. at 694). "A 'reasonable probability is a probability sufficient to undermine confidence in the outcome.'" *Id.* (quoting *Strickland*, 466 U.S. at 694). In order to prevail, the deficient performance must have been of such magnitude that the petitioner was deprived of a fair trial and that the reliability of the outcome was called into question. *Finch*, 226 S.W.3d at 316.

Courts need not approach the *Strickland* test in a specific order or even "address both components of the inquiry if the defendant makes an insufficient showing on one." 466 U.S. at 697; *see also Goad*, 938 S.W.2d at 370 (stating that "failure to prove either deficiency or prejudice provides a sufficient basis to deny relief on the ineffective assistance claim").

The petitioner presents intermingled claims on appeal challenging trial counsels' use, or lack thereof, of expert witnesses at trial. Initially, the petitioner asserts trial counsel failed "to properly present a cohesive defense" by not seeking a child abuse and neglect expert to testify for the defense despite knowing the State planned to present their own child abuse and neglect expert, Dr. Robert Reece. At the evidentiary hearing, however, the petitioner failed to present a child abuse and neglect expert to testify on her behalf. In order "[t]o succeed on a claim of ineffective assistance of counsel for failure to call a witness at trial, a post-conviction petitioner should present that witness at the post-conviction hearing." *Pylant v. State*, 263 S.W.3d 854, 869 (Tenn. 2008) (citing *Black v. State*, 794 S.W.2d 752, 757 (Tenn. Crim. App. 1990)). "As a general rule, this is the only way the petitioner can establish that . . . the failure to have a known witness present or call the witness to the stand resulted in the denial of critical evidence which inured to the prejudice of the petitioner." *Id.* Because the petitioner failed to call a child abuse and

neglect expert at the post-conviction hearing, she cannot meet her burden. *See id.* This issue is without merit.

Similarly, the petitioner also takes issue with trial counsels' decision to rely on a medical expert, Dr. Pietz, rather than a child abuse and neglect expert like the State presented in Dr. Reece. However, at the evidentiary hearing, lead counsel explained her strategy regarding the defense's decision to employ Dr. Pietz, an expert in neonatology. The post-conviction court summarized lead counsel's strategy as follows:

> [Lead counsel] testified that the defense was aware early in the case that the State intended to call Dr. Robert Reece at trial and had indicated at least one of the two neonatologists would testify as well. The trial transcript . . . show[s] that the [c]ourt qualified Dr. Reece as an expert in "pediatrics and child maltreatment" and both neonatologists, Dr. Mary Haynes and Dr. Kendall Graham, testified at trial.

> Based on the State's proof, [lead counsel] believed, and testified at the post-conviction hearing, that no positive medical proof showed the cause of the [victim's] injury; thus, the defense's position was the State was unable to (1) establish when the injury occurred - whether it happened prior to birth in the womb, during labor/birth, or at some point after birth or (2) causation. In short, the State could not make its case based on the medical proof. Accordingly, when [lead counsel] researched experts, she focused on a medical expert to refute the State's neonatologists, and the defense hired neonatologist Dr. Jeffrey Pietz.

As noted by the post-conviction court, lead counsel explained her belief that the medical proof, and planned testimony of Dr. Pietz, supported the defense strategy of attacking causation as the medical proof failed to pinpoint when the victim's injuries occurred. The post-conviction court found "[t]rial [c]ounsels' testimony credible and that the defense made a strategic decision based on reasonable investigation and information they had at the time." Simply because trial counsels' strategy was unsuccessful does not render their assistance ineffective. *Cooper*, 847 S.W.2d at 528; *see also Howell*, 185 S.W.3d 319 at 326. Further, the post-conviction court held "the [p]etitioner has presented no proof that a child abuse expert was available to the defense, would have testified favorably for the defense, or that this proposed expert testimony would have changed the outcome of [the] [p]etitioner's trial." We agree. The petitioner has failed show by clear and convincing evidence how trial counsels' failure to call a child abuse and neglect expert constituted ineffective assistance of counsel. *See Strickland*, 466 U.S. at 694; *Pylant*, 263 S.W.3d at 869. This argument is without merit.

Additionally, the petitioner argues trial counsel was ineffective in preparing Dr. Pietz for trial and, in the end, not calling him as a witness at trial. As explained above, trial counsels' evidentiary hearing testimony provided insight into their defense strategy and the reasoning behind their expert witness choices. However, trial counsel provided further explanation as to why they chose not to call Dr. Pietz as a witness at trial. The post-conviction court summarized trial counsels' reasoning, as follows:

> Based on the report Dr. Pietz supplied, it appeared that he had reviewed all the materials provided by the defense. [Lead counsel] and [co-counsel] testified that it was within a week of trial, at most, that Dr. Pietz expanded his opinion, causing concern - and only when he arrived in Nashville to testify at trial major issues arose.

> Both trial counsel testified that the later opinions given by Dr. Pietz before trial were outside the scope of the report the defense had provided to the State. [Lead counsel] testified that Dr. Pietz's newly realized findings significantly impaired the defense's ability to conduct effective cross-examination of the State's neonatologists and to present Dr. Pietz as a defense witness out of concern he would offer different opinions that would undermine his credibility and open up opportunities for the State to present rebuttal proof. [Co-counsel] testified that Dr. Pietz's newly realized findings were in "contradiction . . . rather than an expansion" to what Dr. Pietz and (sic) previously said. [Co-counsel] further testified that the decision to not call Dr. Pietz was a tactical decision and the defense had gotten out of the experts all they needed.

As noted above, trial counsels' testimony indicates they retained Dr. Pietz as an expert in neonatology to support the defense theory that the medical proof failed to establish when the victim's injuries occurred, either before, during, or after birth. In doing so, trial counsel provided Dr. Pietz with the appropriate materials upon which to render an opinion. When trial counsel learned Dr. Pietz changed his opinion in the days before trial, they then made the strategic decision not to call him as a witness. In deciding not to call Dr. Pietz to testify, trial counsel reasoned Dr. Pietz's wavering opinion may cause the jury to question his credibility. Additionally, trial counsel believed they effectively cross-examined the State's expert witnesses, thus rendering Dr. Pietz's questionable testimony unnecessary. The post-conviction court found trial counsels' strategy to be reasonable, and nothing in the record preponderates against the findings of the post-conviction court. *See Tidwell*, 922 S.W.2d at 500. Furthermore, the petitioner did not present Dr. Pietz at the evidentiary hearing, and the petitioner cannot meet her burden as a result. *Pylant*, 263 S.W.3d at 869. The petitioner's claim that trial

counsel failed to properly prepare and utilize Dr. Pietz as an expert witness in neonatology is without merit.

In denying post-conviction relief, the trial court stated, "[the] [p]etitioner raised several grounds within [her] ineffective assistance of counsel claim; however, [she] failed to establish by clear and convincing evidence that [t]rial [c]ounsel was ineffective or that [she] was prejudiced by any alleged deficiency." We agree with the post-conviction court's assessment of the petitioner's claims. No evidence exists in the record to support her attack on trial counsels' performance or how the alleged deficient performance affected the outcome of her trial. *See Strickland*, 466 U.S. at 687. The petitioner is not entitled to post-conviction relief for her claim of ineffective assistance of counsel.

## CONCLUSION

Based upon the foregoing authorities and reasoning, the judgment of the post-conviction court is affirmed.

_____
J. ROSS DYER, JUDGE